IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID LONDON                          :

                                      :

    v.                                :    Civil Action No. DKC 17-2219

                                      :

LOYOLA HIGH SCHOOL OF BALTIMORE,
INC. t/a Loyola Blakefield        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment
discrimination case is the motion for summary judgment filed by
Defendant Loyola High School of Baltimore, Inc. t/a Loyola
Blakefield. (ECF No. 26). The issues have been briefed, and the
court now rules, no hearing being deemed necessary. Local Rule
105.6. For the following reasons, Defendant's motion will be
granted with respect to Plaintiff's federal claims and
supplemental jurisdiction will be declined with respect to
Plaintiff's state claims.

## I.    Background

### A.    Factual Background

The following facts are presented in the light most favorable
to Plaintiff, the non-moving party.

In September 1988, Plaintiff began working as a Band Director
for Defendant. In March 2016, Defendant notified Plaintiff that
his contract would not be renewed for the 2016-2017 school year.

At the time of the non-renewal, James Katchko was the Chair of the Performing Arts Department, John McCaul was the Assistant Principal, John Marinacci was the Principal, and Anthony Day was the President. Mary Thielen was the Middle School Band Director.

Beginning in 2007, Plaintiff demonstrated work performance issues. For example, in October 2007, Plaintiff forgot that he had a class to teach on two occasions. Defendant subsequently placed him on probation and temporarily withheld a contract for the 2008-2009 school year. Plaintiff ultimately received the contract. In 2013, Defendant instructed Plaintiff to cease contact with the Business Office and, instead, to use Mr. Katchko as a liaison following "disruptive and accusatory[]" behavior that "monopoliz[ed] the time and resources of that office." (ECF No. 26-5). In November 2013, Plaintiff fell asleep during class and Mr. McCaul warned "that sleeping when [he was] expected to be supervising students may lead to immediate termination." (ECF No. 26-6).

In June 2014, Plaintiff sent a letter to Defendant to explain that he recently learned that he had Lyme Disease and that "[t]he only major symptom. . . was enormous fatigue[.]" (ECF No. 26-19). Plaintiff offered this as an explanation for falling asleep in the November 2013 class, but explained that "since beginning treatment, the symptoms and fatigue are completely gone." (*Id.*)

Before the 2015-2016 school year, Mr. Marinacci reviewed stipends paid to faculty members and decided to eliminate Plaintiff's stipend. (ECF No. 29-4, at 4-6). Plaintiff objected to the reduction of his stipend and explained that he received the stipend because his "duties were well beyond those of the ordinary teacher." (ECF No. 29-7). The parties dispute that point, and Defendant maintains that Plaintiff's schedule was not longer than other teachers. (ECF No. 29-4, at 5). Nonetheless, the parties agree that Plaintiff received half the expected stipend amount.

On August 28, 2015, Plaintiff met with Mr. Katchko to discuss an increase in concerns regarding his course during the previous school year. (ECF No. 32-5).

On September 30, 2015, Plaintiff met with Messrs. Marinacci and McCaul to discuss performance issues from the 2014-2015 school year and the creation of a Performance Improvement Plan ("PIP") to assist Plaintiff in his efforts to address the identified issues. (ECF No. 26-7; ECF No. 26-8).

On October 2, 2015, Plaintiff e-mailed Messrs. Day and Marinacci to say that he "may need to go on medical leave at some point" because he was "having increasing difficulty functioning[.]" (ECF No. 26-20).

During the fall, Plaintiff made an arithmetic error on a purchase order for the business office. Plaintiff asked his coworker to double check his arithmetic to eliminate errors.

Defendant offered an Excel program with an addition formula to assist Plaintiff with this task. Defendant explained how to "increase the size and change the contrast to help with vision." (ECF No. 29-4, at 10).

In October or November of 2015, Plaintiff assisted Ms. Thielen with one of her classes and instructed the drum section separately. When the students' focus lagged, Plaintiff discussed locking them in the music room until they got it right and discussed tasers with the students. (ECF No. 29-2, at 22-25). The parties disagree about the nature of this conversation. Plaintiff maintains that his comments were jokes, (ECF No. 29-13 at 2), and Defendant characterizes them in a more serious manner.

Plaintiff received the PIP on December 3, 2015. (ECF No. 26-8). On December 18, 2015, Plaintiff met with Allison Panowitz, the Human Resources Manager for Defendant, and "expressed vague claims of workplace harassment and discrimination." (ECF No. 26-22).

The Human Resources Department completed its investigation in January 2016 and informed Plaintiff that it found no evidence of discrimination. (ECF No. 26-22).

In January 2016, Ms. Thielen provided evaluations to her students and asked how they thought she could improve the class. Some of the evaluations referenced Plaintiff's earlier comments

about locking the students in a room or tasing them. (ECF No. 26-11; ECF No. 26-12).

On March 1, 2016, Plaintiff's doctor sent a letter to Defendant to explain that "[d]ue to [Plaintiff's] medical issues, he is having a difficult time doing detailed paperwork." (ECF No. 26-21). On March 4, 2016, Mr. McCaul e-mailed Plaintiff regarding the doctor's note and asked whether the medical condition makes completing accurate paperwork difficult such that he needs more time or makes completing accurate paperwork impossible. (ECF No. 29-13). Mr. McCaul also informed Plaintiff about the students' negative evaluations, described "two comments of particular concern," and asked Plaintiff to provide his availability to discuss the evaluations. (*Id.*) This was the first that Plaintiff learned of the evaluations, and he quickly sought to discuss them with Ms. Thielen and the students. (ECF No. 29-2, at 24). Plaintiff knew which students wrote the evaluations because "[t]hose [were] the only ones in the middle school that [he] told that joke to." (*Id.*, at 26). Ms. Thielen found Plaintiff's conduct "very disturbing" and described the students as "visibly upset" by Plaintiff's actions.[1] (ECF No. 26-12). Defendant

---

[1] Plaintiff's opposition notes that Ms. Thielen's affidavit describes this incident as occurring in January 2016 and attempts to discredit it because all other accounts describe the incident as occurring in March 2016. (ECF No. 29, at 12). Plaintiff admits that the students submitted the evaluations in January 2016, that he learned of them in March 2016, and that he spoke to the students

informed Plaintiff that his contract would not be renewed in late March 2016.

### B. Procedural Background

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on October 11, 2016. Plaintiff argued that Defendant discriminated against him based on age, disability, and retaliation. (ECF No. 26-14). The EEOC dismissed Plaintiff's complaint on May 10, 2017. (ECF No. 26-15). Plaintiff then filed a complaint in this court on August 7, 2017. (ECF No. 1). Plaintiff contends that Defendant's decision not to renew his contract constitutes employment discrimination on the basis of age and disability in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Following discovery, Defendant filed the pending motion for summary judgment on November 8, 2018. (ECF No. 26). Plaintiff filed an opposition (ECF No. 29) and Defendant replied (ECF No. 32).

## II. Standard of Review

Summary judgment will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty*

---

and Ms. Thielen in March 2016. (ECF No. 26-13, at 2; *see also* ECF No. 29-2, at 24-25).

*Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 249.  In undertaking this inquiry, a court must view the facts "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Shina v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), aff'd 746 F.3d 546 (4th Cir. 2014).

## III. Age Discrimination

Plaintiff alleges that Defendant's non-renewal of his contract constitutes age discrimination under the ADEA. The ADEA makes it "unlawful for an employer. . . to discharge any individual or otherwise discriminate against any individual. . . because of such individual's age[.]" 29 U.S.C. § 623(a)(1). Plaintiff may establish age discrimination under the ADEA in two ways: (1) through direct evidence; or (2) through circumstantial evidence under the three-step burden shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under the first step of the *McDonnell Douglas* framework, Plaintiff must establish a *prima facie* case of discrimination. *See* 411 U.S. at 802. At the second step, the burden shifts to Defendant to present a legitimate, nondiscriminatory reason for the alleged adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). At the third step, Plaintiff must prove that Defendant's proffered reasons "were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143.

Plaintiff has presented no direct evidence that the contract non-renewal was based on his age and does not rely on this method in his opposition brief. He therefore must proceed under the *McDonnell Douglas* pretext framework. To meet the first step of the *McDonnell Douglas* framework and establish a *prima facie* case

of age discrimination for termination, Plaintiff must show that: (1) he is a member of a protected class, which for the ADEA is individuals who are at least 40 years of age, 29 U.S.C. § 631(a); (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc), *cert. dismissed*, 543 U.S. 1132 (2005).

The parties do not appear to dispute that Plaintiff satisfies the first two requirements. They focus their briefing on the third prong. Plaintiff asserts that he was meeting Defendant's legitimate expectations because the "facts show that [he] was given a renewed contract each year[.]" (ECF No. 29, at 4-5). Defendant highlights Plaintiff's "mixed" job performance over his tenure at the school, (ECF No. 26-1, at 1-2) and emphasizes that Plaintiff "was placed on a PIP, in November[] 2015 and by March[] 2016 he still had deficiencies with his work." (*Id.*, at 16).

The reasonable expectations analysis in this case is complex. Defendant characterizes the incident with the student evaluations as "the deciding factor" in its decision not to renew Plaintiff's contract. (ECF No. 26-1, at 12; ECF No. 32, at 5).[2] As Judge

---

[2] Deposition testimony from Messrs. Marinacci and McCaul supports this characterization. (*See* ECF No. 26-16, at 4 (The

9

Chuang explained in *Gordon v. Holy Cross Hosp. Germantown, Inc.*, 385 F.Supp.3d 472, 479 (D.Md. 2019), "a single instance of misconduct is more relevant to the question of the employer's legitimate nondiscriminatory reason for termination[]" than the employee's failure to meet the employer's legitimate job expectations. The *Gordon* plaintiff is distinguishable because she "maintained a spotless employment record[.]" *Id.* at 475. Plaintiff's employment record, in contrast, includes a probationary period for lack of judgment and for failing to attend two classes and to supervise students, (ECF No. 26-3), and placement on the PIP to address performance issues. (ECF No. 26-8). The distinction suggests Plaintiff may not have been meeting Defendant's reasonable expectations. *Id.* at 479 (When "the plaintiff had an ongoing history of poor job performance, courts have analyzed that deficiency as a failure to satisfy the *prima facie* case element of meeting the employer's legitimate expectations."); *see also Warch v. Ohio Cas. Ins. Co.*, 435 F.3d

---

decision not to renew Plaintiff's contract had been difficult for Mr. Marinacci "until. . . the point about [Plaintiff] confronting both a colleague and the sixth grade boys."); ECF No. 26-17, at 3 (Mr. McCaul "thought it was probable that [Plaintiff] would come back" until "[h]e pulled. . . kids out of a class that wasn't his and threatened them."); ECF No. 32-2, at 4 (Mr. Marinacci describing "[t]he single greatest factor" in the non-renewal decision "was the feedback from the students and [Plaintiff's] reaction to it, his interaction with Ms. Thielen, his pulling students out of another teacher's class, him bringing them into another room and confronting them on what was supposed to be an honest feedback.")).

510, 515–18 (4ᵗʰ Cir. 2006) (holding that an employee failed to show he was meeting his employer's legitimate expectations when his performance included repeated failures and placement on probation). However, the people judging Plaintiff's performance were the same individuals that he accused of discrimination. In such a scenario, "[a]ll the *prima facie* factors may be unnecessary[]" because "even if an employee was not meeting his employer's legitimate expectations, he can still establish a *prima facie* case if the company applied its expectations against him in a discriminatory manner." *Santangelo v. Crown Cork & Seal USA, Inc.*, 255 F.Supp.3d 791, 802 (N.D.Ill. 2017) (internal alterations, citations, and quotation marks omitted). The court need not parse these complexities because, as discussed below, Plaintiff failed to produce any evidence to create a dispute of material fact regarding the final prong of the *prima facie* case: the position remained open or was filled by similarly qualified applicants outside the protected class.

In his opposition, Plaintiff misstates the fourth requirement and contends he must show "damages." (ECF No. 29, at 16). Plaintiff is incorrect. Plaintiff has provided no evidence that Defendant replaced him with a similarly qualified, substantially younger individual. Plaintiff contends that "no other younger. . . faculty member with years of distinguished performance was ever terminated by [Defendant] for such manufactured and/or

insignificant reasons." (ECF No. 1, at 22 ¶ 129). Plaintiff has not identified any comparator, as Defendant notes. (ECF No. 26-1, at 10) (Plaintiff "has not identified any other similarly situated [Defendant] instructors under the age of 40 who engaged in similar misconduct who [were] treated more favorably than he was."). Plaintiff has failed to produce evidence necessary to satisfy the final prong of the prima facie case.[3]

## IV.  Disability Discrimination

Plaintiff alleges that Defendant's actions also constituted disability discrimination under the ADA. He appears to raise two challenges: (1) wrongful discharge and (2) failure to accommodate.

### A.  Wrongful Discharge

The parties fail to articulate the correct standard for assessing wrongful discharge claims under the ADA.[4]  To show wrongful discharge under the ADA, a plaintiff must prove that:

---

[3] Even if Plaintiff produced evidence sufficient to satisfy the *prima facie* case for age discrimination (or, in fact, sufficient to satisfy the *prima facie* case for disability discrimination, *see* Section IV.A.), he nevertheless fails to produce evidence to satisfy the third step of the *McDonnell Douglas* framework.  As will be discussed in Section VI, Defendant articulated a legitimate, non-discriminatory reason for the contract non-renewal and Plaintiff failed to produce evidence showing that the articulated reason was a pretext for discrimination or retaliation.

[4] Defendant conflates the *prima facie* tests for age and disability discrimination. (ECF No. 26-1, at 16; ECF No. 32, at 14–15).  Plaintiff misstates the fourth prong of the *prima facie* test as damages. (ECF No. 29, at 16).

"(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001); *see also Ennis v. Nat'l Ass'n of Bus. And Educ. Radio, Inc.*, 53 F.3d 55 (4th Cir. 1995). The fourth prong of an ADA wrongful discharge case is different than those applied in other contexts for two reasons. *Ennis*, 53 F.3d at 58. "First, where disability, in contrast to race, age, or gender, is at issue, the plaintiff in many, if not most, cases will be unable to determine whether a replacement employee is within or without the protected class, that is, whether or not that person is disabled or associates with a disabled person." *Id.* "Second, even if the plaintiff could obtain such information, requiring a showing that the replacement was outside the protected class would lead to the dismissal of many legitimate disability discrimination claims, since most replacements would fall within the broad scope of the ADA's protected class[.]" *Id.*

Plaintiff fails to produce any evidence to suggest that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

## B. Failure to Accommodate

To establish a *prima facie* case for failure to accommodate, Plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal alterations and quotation marks omitted).

Plaintiff's opposition does not address the *prima facie* elements of a failure to accommodate claim. Instead, Plaintiff contends that he suggested that his coworker double check his math on purchase orders to address Defendant's concern regarding inaccurate purchase orders, and Defendant refused. (ECF No. 29, at 6). Plaintiff elaborates that Defendant's "preferred accommodation did not work for [him,]" because the recommended Excel program made his problem worse. (ECF No. 29, at 7). Defendant contends that Plaintiff failed to establish that he had a disability covered by the ADA or that his medical conditions prevented him from performing the essential functions of his job with or without an accommodation. (ECF No. 26-1, at 12–13).

Assuming *arguendo* that Plaintiff was an individual who had a disability within the meaning of the statute and that Defendant had notice of his disability, Plaintiff nonetheless cannot establish that he could perform the essential functions of his position with reasonable accommodation. The Fourth Circuit outlined the relevant framework in *Jacobs v. N.C. Administrative Office of the Courts*:

> This inquiry proceeds in two steps. First, was the specific accommodation requested [by the employee] reasonable? Second, had [the employer] granted the accommodation, could [the employee] perform the essential functions of the position?
>
> A reasonable accommodation is one that enables a qualified individual with a disability to perform the essential functions of a position. The statute expressly contemplates that a reasonable accommodation may require job restructuring. . . An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform *all* of the essential functions of [his] position."

780 F.3d 562, 580–81 (4th Cir. 2015) (internal alterations, citations, and quotation marks omitted) (emphasis in original). Here, Plaintiff's proposed accommodation was to allow his co-worker to double check his math for errors. Defendant was not required to grant this proposal because it did not enable Plaintiff to perform all his essential functions. *Id.* at 581. Moreover, while "[t]he ADA imposes upon employers a good-faith duty to engage with their employees in an interactive process to identify a reasonable accommodation[,]" "an employer will not be liable for

failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow [him] to perform the essential functions of the position." *Id.*

Finally, Plaintiff also failed to allege facts to satisfy the final prong of the failure to accommodate claim. Defendant did not refuse to make any accommodation, it refused Plaintiff's only offered accommodation and recommended an alternative. An accommodation can be reasonable even if it is not the employee's requested accommodation. *See Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015) ("An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested."); *see also Dones v. Brennan*, 147 F.Supp.3d 364, 369 (D.Md. 2015) ("[A]n employer is not required to provide the employee's preferred accommodation."); *Scott v. Montgomery Cnty. Gov't*, 164 F.Supp2d. 502, 508-09 (D.Md. 2001) ("The ADA does not require an employer to provide the specific accommodation requested, or even to provide the best accommodation, so long as the accommodation is reasonable.") (quoting *Walter v. United Airlines, Inc.*, 2000 WL 1587489, at *4 (4th Cir. 2000) (internal alterations and quotation marks omitted). Plaintiff has not produced evidence necessary to satisfy the *prima facie* elements of a failure to accommodate claim.

## V.    Retaliation

The ADEA and the ADA prohibit employers from discrimination against employees who oppose actions that the respective statutes outlaw.    29 U.S.C. § 623(d); 42 U.S.C. § 12203(a).    Plaintiff alleges that Defendant's decision not to renew his contract was retaliation for his submission of a complaint to Defendant's Human Resources Department.

The elements for retaliation under both the ADA and the ADEA are identical; to establish a *prima facie* case of retaliation, Plaintiff must show: (1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the adverse action.    *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006); *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011). If the plaintiff establishes a *prima facie* case, then the *McDonnell Douglas* pretext framework applies.    *See Haulbrook*, 252 at 706.

The parties do not appear to dispute the first two elements of the *prima facie* case.    Filing a complaint with Human Resources is protected activity and the non-renewal of Plaintiff's contract is an adverse employment action.    Defendant contends that Plaintiff cannot satisfy the third requirement because the non-renewal of his contract was not causally related to his complaint to Human Resources and emphasizes that Plaintiff's "performance became an

17

issue. . . well before he filed any complaint of harassment or discrimination[.]" (ECF No. 26-1, at 17–19).

"To establish a causal connection, plaintiffs must show that the employer took action *because* they engaged in a protected activity." *See Davenport v. Anne Arundel Cnty. Bd. Of Educ.*, 998 F.Supp.2d 428, 439 (D.Md. 2014) (emphasis in original). The temporal proximity between the protected activity and the adverse employment action may provide indirect proof of causation. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994).

Here, Defendant informed Plaintiff that his performance was at issue and that he would be placed on the PIP in September 2015 – months before Plaintiff lodged his complaint in December 2015 with the Human Resources department. (ECF No. 26-7). Defendant notified Plaintiff that his contract would not be renewed in March 2016 – months after Plaintiff initiated his complaint and the department investigated and resolved it. (ECF No. 26-22); (ECF No. 26-10). Moreover, although Plaintiff characterizes his comments to the sixth-grade students as jokes intended to motivate, the record demonstrates that "[t]he single greatest factor [in Defendant's decision not to renew Plaintiff's contract] was the feedback from the students and [Plaintiff's reaction] to it, his interaction with Ms. Thielen, his pulling students out of another teacher's class, him bringing them into another room and

confronting them on what was supposed to be an honest feedback."
(ECF No. 29-4, at 13). Prior to the events surrounding the
evaluation, Defendant expected to renew Plaintiff's contract.
(*Id.*, at 12). After the events, Defendant communicated its
decision not to renew Plaintiff's contract within a month. The
timing between Plaintiff's conduct toward the students and his co-
worker regarding the evaluations and Defendant's decision not to
renew his contract supports Defendant's contention that
performance deficiencies motivated the decision. Plaintiff failed
to establish his *prima facie* case of retaliation because he did
not present evidence of a causal link between his report to Human
Resources and the non-renewal of his contract.

## VI. The Second and Third Steps of the *McDonnell Douglas* Framework

Even if Plaintiff produced evidence sufficient to establish
a *prima facie* case for any of his termination or retaliation
claims, Defendant articulated a legitimate, non-discriminatory
reason for the contract non-renewal and Plaintiff failed to show
that the articulated reason was a pretext for discrimination or
retaliation. Defendant identified Plaintiff's conduct surrounding
the student evaluations as "the deciding factor" in its decision
not to renew Plaintiff's contract. (ECF No. 26-1, at 12; ECF No.
32, at 5). Plaintiff has not produced any facts to show that
Defendant's articulated reason was pretext. "To do so, [Plaintiff]
must do more than simply show the articulated reason is false[.]"

*Laber*, 438 F.3d at 430.  Plaintiff can meet his pretextual burden "either by showing [Defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of. . . discrimination." *Davenport*, 998 F.Supp.2d. at 437.  Plaintiff contends that he was joking with the students and that Defendant exaggerated its response.  These conclusory allegations are insufficient.  Plaintiff may disagree with Defendant's response, but he failed to show that Defendant's decision not to renew his contract was pretext.

## VII. Remaining State Law Claims

The parties do not address Plaintiff's claims alleging violations of Maryland's anti-discrimination statute, Md.Code. Ann. State Gov't § 20-606.  State law claims raised in a complaint with federal claims may be heard by this court under its supplemental jurisdiction.  This court may, however, decline to exercise its supplemental jurisdiction over state law claims where the federal claims are dismissed.  *See* 28 U.S.C. § 1367(c).  When, as here, the federal claims are eliminated early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction.  *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

## VIII.    Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant Loyola High School of Baltimore, Inc. t/a Loyola Blakefield will be granted with respect to Plaintiff's federal claims and supplemental jurisdiction will be declined with respect to Plaintiff's state claims.  A separate order will follow.


                                    _____/s/_____
                                    DEBORAH K. CHASANOW
                                    United States District Judge